COMMONWEALTH *VS.* GEORGE P. MCLAUGHLIN.

Suffolk.    April 2, 1973. — November 1, 1973.

Present:    TAURO, C.J., REARDON, QUIRICO, HENNESSEY, & KAPLAN, JJ.

*Evidence,* Admissions and confessions, Hearsay, Spontaneous utterance.
*Constitutional Law,* Confrontation of witnesses. *Practice, Criminal,*
New trial, Judicial discretion, Appeal, Sentence, Capital case. *Supreme
Judicial Court,* Argument.

In the course of a joint trial involving several defendants, one of them
charged with murder and a second charged with being an accessory after
the fact, where knowledge that the first defendant had committed a
homicide was an element required to be proved by the Commonwealth
in order to convict the second defendant, evidence of a remark uttered
by the second defendant in the absence of the first defendant, that the
latter had "shot someone" was properly admitted with limiting instruc-
tions by the trial judge to the jury that it was admitted only against the
second defendant as an admission tending to prove such knowledge.
[215-218]
Whether hearsay evidence of a statement inculpating a defendant in a
criminal case, made in his absence, should be admitted on the ground
that the statement was a spontaneous utterance lies in the discretion of
the trial judge. [221-223]
The admission against a defendant in a criminal case of hearsay evidence
of a statement inculpating him, made in his absence, where the trial
judge found facts showing that the statement was a spontaneous utter-
ance, did not violate the defendant's right under the Confrontation
Clause of the Sixth Amendment of the Federal Constitution or the rule
of *Bruton* v. *United States,* 391 U. S. 123. [218-221, 224-225]
A motion for a new trial may not be used as a vehicle to compel a trial
judge to review and reconsider questions of law which were actually
raised at the trial and reviewed by an appellate court or which could
have been raised at the trial and in appellate review after trial but which
were not so raised. [229]
Although the trial judge in a criminal case, on a motion for new trial,
might in his discretion have considered issues which the defendant could
have raised, but did not raise, at trial and on original appellate review by
this court, and if he had so considered such issues his action thereon
would have been subject to review by this court, where he did not con-
sider them they were not open in this court on appeal from denial of the
motion. [229-231]

Commonwealth *v*. McLaughlin.

Where a motion by the defendant in a criminal case to inspect grand jury minutes was denied and he assigned error, he must be deemed to have waived the alleged error by his failing to argue it or otherwise mention it in his brief. [231-232]

Where the defendant in a criminal case attempted on appeal from denial of a motion for a new trial to assert an additional claim, not considered by the trial judge, based upon certain decisions of the Supreme Court of the United States promulgated some twenty months after the denial of the motion, such additional claim was not properly before this court and was not dealt with by it. [233-235]

A defendant convicted of murder in the first degree and sentenced to death in the absence of a recommendation by the jury under G. L. c. 265, § 2, that the death penalty not be imposed was entitled, under *Furman* v. *Georgia,* 408 U. S. 238, and *Stewart* v. *Massachusetts,* 408 U. S. 845, to have the death sentence vacated and to be resentenced to life imprisonment. [235]

INDICTMENT found and returned in the Superior Court on March 4, 1965.

Certain motions were heard by *Forte, J.*

*Alexander Whiteside, II,* for the defendant.

*Newman A. Flanagan,* Assistant District Attorney (*Elizabeth C. Casey,* Legal Assistant to the District Attorney, with him) for the Commonwealth.

QUIRICO, J. In October, 1965, the defendant was tried and found guilty by a jury on an indictment charging him with the murder in the first degree of one William J. Sheridan on March 15, 1964. The jury made no recommendation that the otherwise mandatory sentence of death be not imposed and the defendant was therefore sentenced to death. G. L. c. 265, § 2, as appearing in St. 1951, c. 203. The sentence of death has not been executed, nor has it been vacated pursuant to the decision in *Furman* v. *Georgia,* 408 U. S. 238 (1972). The case came before this court on direct appellate review and the judgment was affirmed on March 9, 1967, in *Commonwealth* v. *McLaughlin,* 352 Mass. 218, cert. den. sub nom. *McLaughlin* v. *Massachusetts,* 389 U. S. 916 (1967).

The case comes before us now primarily on the defendant's appeal from the denial of his motion for a new trial filed on September 6, 1970, and supplemented on November

10, 1970. The motion appears to be based solely on the decision of the United States Supreme Court on May 20, 1968, in *Bruton* v. *United States,* 391 U. S. 123, held to apply retroactively in *Roberts* v. *Russell,* 392 U. S. 293 (1968), but the defendant is attempting to raise additional questions on his appeal from the denial of the motion.

The proceedings and the evidence presented at the defendant's trial are described in our opinion in 352 Mass. 218, to which reference may be had for details not repeated in the present opinion.

On the evening of March 14, 1964, Sheridan, the defendant and others attended a party held in a second floor apartment at 55 Yeoman Street, Roxbury. The defendant was accompanied by Maureen Dellamano who had an apartment on the first floor in the same building. Sheridan left the party before midnight after an argument with another guest. Several other guests were ejected shortly after midnight but they remained on the second floor landing. The defendant left the party with Dellamano. He asked the persons on the landing to "clear the hallway" and he had an altercation with one of them. He then went down the stairs, opened the door to the Dellamano apartment with a key and entered. The persons on the landing fled and one of them, while in a courtyard in front of the building, heard a shot and saw someone fall in the doorway. Herbert Josselyn was on his way to the party and was standing outside the building about twenty feet from the doorway at the time. He saw two men standing in the doorway. One of the men whom he identified as the defendant suddenly pulled out a pistol and shot the other man. A policeman who was summoned to the scene found Sheridan lying in the doorway with a gunshot wound in his head. Sheridan was dead on arrival at a hospital.

Two indictments were returned against the defendant, one charging him with murder of Sheridan in the first degree, and the other charging him with unlawfully carrying a firearm. Three other persons, Dellamano, Frances Bithoney and James S. O'Toole, were charged in separate indictments with the crime of being accessories after the fact to the

defendant's alleged murder of Sheridan.

On October 1, 1965, O'Toole filed and argued a written motion that his trial be severed from that of the defendant. The motion was denied by the judge at the close of the argument. The defendant, although present, made no statement on the motion.

On October 5, 1965, the Commonwealth moved for a joint trial of all five indictments and of all persons named therein. O'Toole renewed his motion to sever his trial from that of the other persons indicted, and it was again denied by the judge. Counsel for Bithoney then argued a motion for severance which was opposed by the Commonwealth and was denied by the judge. The defendant and his counsel, although present, made no statement on those motions.

Counsel for the defendant then argued a motion for a change of venue and a motion for a continuance. During the course of argument he made the following statement about one or both of the motions for severance filed by O'Toole and Bithoney: "[O]n the Motion to Sever . . . I will tell you why the District Attorney is opposing it; not because of the money [required to be expended for separate trials], but there are supposed to have been alleged statements — and . . . I think it is put in just to be prejudicial — there's supposed to have been statements made by a codefendant, not in the presence of . . . McLaughlin, which would never be able to be used in evidence against . . . McLaughlin. But no matter how careful you will be in your instructions to a jury, . . . they will have heard it. And I say once they heard it it's indelibly implanted in their minds; and no matter what you say or what I [or other counsel] say about disregarding it . . . . the jury have heard it; and the man that will suffer is George McLaughlin. That is the reason . . . they don't want a severance. And I say it is the only reason." Despite this statement, there is no indication in the record that the defendant or his counsel ever moved for a trial separate from the other indicted persons.

The joint trial of the defendant, Dellamano, Bithoney and O'Toole started on October 5, 1965, and all four were found

guilty on October 26, 1965. Neither the defendant nor Dellamano testified at the trial.

The witnesses called by the Commonwealth at the joint trial included Bernard Flaherty, Thomas Barry and Donald Buckley. Their testimony, as pertinent to the defendant's claim that his rights under the rule of the *Bruton* case were violated, is summarized. Each was at the party in question and they saw the defendant there with Dellamano. Each while still in the apartment where the party was held heard a noise from the hallway between 12:15 A.M. and 12:30 A.M. after the party had started to break up. Flaherty described the noise as a "bang," Barry described it as a "loud bang," and Buckley described it as "a noise like a fire cracker." Each then saw Dellamano run through the door into the apartment where they were and heard her make a statement. Flaherty described her as shaken up and nervous, and he heard her say "George shot someone." Barry described her as hysterical, and heard her say "George shot somebody." Buckley heard her say "George shot somebody, someone — George did it — he did it." Flaherty said the Dellamano entry and statement occurred "a couple of seconds" after he heard the shot. Barry said it occurred "a minute or so" after he heard the loud bang. Buckley said that upon hearing the "noise like a fire cracker" he opened the door from the apartment to the hallway and that the Dellamano entry occurred "maybe two seconds or three seconds" thereafter.

When the witness Flaherty was asked to testify about the statement of Dellamano inculpating the defendant, the latter objected because the statement was not made in his presence, and asked that the jury be instructed that the testimony was not admitted as to him. The judge refused to impose such a limitation on the evidence saying: "I am not ready to say that. This is all part of the res gestae. . . . I am allowing it as part of the res gestae here. He heard a bang and she said, 'George shot someone.'" The defendant saved no exception at that point. Counsel for the defendant cross-examined Flaherty extensively, but did not question him about the Dellamano statement.

When the witness Barry was asked to testify about the same Dellamano statement, counsel for the defendant requested a voir dire. The request was denied and the defendant excepted. After the witness testified as to the Dellamano statement, counsel for the defendant asked that the testimony be struck as to the defendant. The judge then said, "I will allow it de bene," and the defendant excepted. His counsel cross-examined this witness at length, but did not question him about the Dellamano statement.

When the assistant district attorney prosecuting the case asked the witness Buckley to testify about the same Dellamano statement, he asked that the question and answer "be admitted as against the defendant Dellamano only." After the witness had answered the question the judge instructed the jury as follows: "I am going to admit this statement that you have heard only as against the defendant Maureen Dellamano and against no other defendant. . . . Anything that is said or done not in the presence of a defendant is not admissible against him. The only one present when this statement allegedly was made was Maureen Dellamano. Therefore, it is admissible only against her." Counsel for McLaughlin also cross-examined this witness at length, but did not question him about the Dellamano statement. On redirect examination this witness said that the Dellamano statement was "George did it. He did it. Get rid of him." The judge also limited that testimony to the defendant Dellamano.

In charging the jury the only point at which the judge made reference to the statement allegedly made by Dellamano to the effect that George shot someone was in the course of his instructions on the indictment charging Dellamano with being an accessory after the fact to the murder. He told the jury that the evidence of this statement by Dellamano indicated knowledge by her that the defendant had committed a homicide, and that it had been admitted only against Dellamano as an admission by her. He concluded this phase of the instructions by saying: "The other defendants were not present when Maureen Dellamano made

Commonwealth *v.* McLaughlin.

that statement. Therefore, you consider that evidence only against her."[1]

At the close of the judge's charge to the jury, counsel for the defendant requested him to "instruct the Jury that in considering the murder, they are not to discuss any evidence concerning what Maureen Dellamano is supposed to have said, that they are not to entertain anything in the case against my client. They should be instructed, because if made this was done not in his presence." The judge answered, "I think I made it very, very clear," and refused to instruct further. The defendant's exception on this point was disposed of in the following language in our earlier opinion in 352 Mass. 218, 226: "McLaughlin contends that the admission of the Dellamano remark was error and that the error was not cured by the judge's instructions. We disagree. The judge made it abundantly clear both during the trial and in his charge that the remark was admissible only against Dellamano. In view of the limitation on this evidence, we need not consider whether it might have been admissible against McLaughlin under the exception to the hearsay rule which admits spontaneous declarations. See *Commonwealth* v. *Hampton,* 351 Mass. 447."

---

[1] The charge on this phase of the case was as follows. "Did she [Dellamano] know that McLaughlin did kill William Sheridan? Do you believe the evidence that said she was hysterical and went into the room and said 'George killed someone.' . . .

"If you believe that, that indicates knowledge of McLaughlin having committed a homicide. I admitted that in evidence and I have not discussed it yet, because I admitted it only against Maureen Dellamano and it can be considered only in the indictment against her.

"If her case had been tried separately from the others, 'George killed someone — get rid of him,' it would not be admissible, because we have strict rules of evidence. They are the result of generations of experience.

"You heard me say more than once during the trial, 'You can only hear first-hand information.' A witness cannot say to the Jury what he heard or what he himself said outside of the court, not under oath, and not subject to cross examination. That is called the hearsay rule.

"I admitted such evidence because there are a number of exceptions. And one of those exceptions is that any person, any party to an action, in a criminal case, if any defendant makes a statement outside the court, the Jury may hear it. If it's good enough for that person, it's worthy enough for the Jury, even though it was not made in the presence of a Jury, under oath, and subject to cross examination.

"But it is only considered against that person or any other defendant who happened to be present. The other defendants were not present when Maureen Dellamano made that statement. Therefore, you consider that evidence only against her."

On the indictment against Dellamano the Commonwealth was required to prove, as one element of the crime charged, that she knew that the defendant had committed a felony. G. L. c. 274, § 4. It is therefore clear that the statement allegedly made by Dellamano was properly admitted against her as an admission tending to prove such knowledge.

A. *Motion for New Trial Based on Bruton Rule.*

The question before us is whether the defendant's rights under the rule of the *Bruton* case were violated, notwithstanding the fact that all of the testimony of the Dellamano statement was ultimately limited in application solely to Dellamano by virtue of the judge's instructions to the jury. This in turn involves the questions (a) whether the Dellamano statement would have been admissible against the defendant if the indictments against him had been tried separately from that against Dellamano, and (b) whether it was properly admitted against him in the joint trial when offered through the testimony of Flaherty and Barry.

*Bruton* v. *United States,* 391 U. S. 123, decided on May 20, 1968, involved a joint trial resulting in the conviction of two persons, Bruton and Evans, for armed robbery. The evidence at the trial included testimony of an oral confession made by Evans inculpating Bruton, but made in the absence of Bruton. Evans did not take the witness stand and therefore could not be cross-examined by Bruton. The trial judge instructed the jury to the effect that the confession " 'can only be used against the defendant Evans. It is hearsay insofar as the defendant . . . Bruton is concerned, and you are not to consider it in any respect to the defendant Bruton, because insofar as he is concerned it is hearsay . . . [and] you must not consider it, and should disregard it, in considering the evidence in the case against the defendant Bruton.' " 391 U. S. 123, 125, fn. 2. The judge in the present case gave the jury substantially similar instructions. The United States Supreme Court reversed Bruton's conviction and in doing so it said (p. 126): "We hold that, because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial state-

ments in determining petitioner's [Bruton's] guilt, admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment.''

We have applied the rule of the *Bruton* case retroactively to reverse convictions in several cases. In *Commonwealth* v. *Carita,* 356 Mass. 132, 138-139 (1969), we said: *"Bruton* v. *United States,* 391 U. S. 123, came down on May 20, 1968, and was followed by *Roberts* v. *Russell,* 392 U. S. 293, on June 10, 1968, which gave the *Bruton* case retroactive application to State and Federal prosecutions to crime. The *Bruton* case, which binds us, set aside the conviction of a defendant at a joint trial although the jury were instructed that a codefendant's confession inculpating the defendant was to be disregarded by the jury in their determination of the defendant's guilt or innocence.'' See *Commonwealth* v. *McKenna,* 355 Mass. 313, 326 (1969). We also applied the rule of the *Bruton* case retroactively to reverse convictions in *Commonwealth* v. *Sarro,* 356 Mass. 100, 102 (1969), and *Kiley* v. *Commonwealth,* 358 Mass. 800 (1970).

In deciding the applicability of the *Bruton* rule to the present case, it is important to note that the rule does not purport to hold that a defendant's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment is violated whenever hearsay evidence is admitted against him and he is not able to cross-examine the person to whom the hearsay statement is attributed. The court was very careful to point out an important limitation on the scope of its decision by the following language (less citations) in the footnote at 391 U. S. 128: ''We emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence, . . . the problem arising only because the statement was (but for the violation of . . . [*Miranda* v. *Arizona,* 384 U. S. 436 (1966), and *Westover* v. *United States,* 384 U. S. 494 (1966)] admissible against the declarant Evans. . . . There is not before us, therefore, any recognized exception to the hearsay rule insofar as petitioner is concerned and we intimate no

view whatever that such exceptions necessarily raise questions under the Confrontation Clause." In this footnote the court cited cases, textbooks and law review articles dealing with two exceptions to the hearsay rule, viz. (a) an admission by a party, and (b) a statement by a co-conspirator.

A number of cases decided since the *Bruton* case have held that defendants' rights under the Confrontation Clause of the Sixth Amendment were not violated where hearsay evidence of a statement of a co-conspirator inculpating the defendant was admitted without opportunity by the defendant to cross-examine the co-conspirator. Most of these cases involved statements attributed to a co-conspirator during the course of and in furtherance of the conspiracy. *Commonwealth* v. *Beneficial Fin. Co.* 360 Mass. 188, 222-223 (1971). *Migliore* v. *United States,* 409 F. 2d 786 (5th Cir. 1969). *Campbell* v. *United States,* 415 F. 2d 356 (6th Cir. 1969). *Kay* v. *United States,* 421 F. 2d 1007 (9th Cir. 1970). *McGregor* v. *United States,* 422 F. 2d 925 (5th Cir. 1970). *United States* v. *Weber,* 437 F. 2d 327 (3d Cir. 1970). *Howell* v. *United States,* 300 F. Supp. 1017, 1019-1020 (N. D. Ill. 1969). *United States* v. *Zentgraf,* 310 F. Supp. 268, 271 (N. D. Cal. 1970). However, in *Dutton* v. *Evans,* 400 U. S. 74, 81 (1970), the disputed hearsay evidence of a statement of a co-conspirator not on trial was held properly admitted against the sole defendant under an exception recognized by the law of Georgia permitting the introduction of such out-of-court statements even though made during "the concealment phase of the conspiracy."

The footnote to the *Bruton* case discussed above did not purport to be a complete or exhaustive statement of all the exceptions under which the admission of inculpatory hearsay evidence would not violate the *Bruton* rule notwithstanding the fact that the defendant has no opportunity to cross-examine the person to whom the hearsay statement is attributed.[2]

---

[2]Professor Wigmore uses the fourteen following topics for his discussion of the exceptions to the hearsay rule: dying declarations, statements of facts against interest, declarations about family history (pedigree), attestation of a subscribing witness, regular entries (in business or other records), sundry statements of deceased

In addition to the cases upholding the admission of evidence against a claim of violation of the *Bruton* rule under exceptions to the hearsay rule for statements of co-conspirators, there are decisions upholding the admission under other exceptions. In *United States* v. *Chee,* 422 F. 2d 52 (9th Cir. 1970), the admission of the evidence was upheld under the "res gestae" exception to the hearsay rule. A similar result was reached in *People* v. *Kelley,* 32 Mich. App. 126, 133 (1971), in relation to hearsay evidence that a co-defendant said to the defendant "you threw the match too quick." *People* v. *Gauthier,* 28 Mich. App. 318 (1970) rejected a claim that the admission of material under the business record exception to the hearsay rule violated the *Bruton* rule.

The Commonwealth contends that the hearsay testimony of the witnesses Flaherty, Barry and Buckley about the Dellamano statement inculpating the defendant was admissible against the defendant under the "spontaneous exclamation" exception, sometimes also called or referred to as the "res gestae"[3] exception, to the hearsay rule; and that it would not have been error for the judge to have admitted that testimony against the defendant. We agree with that contention.

The exception to the hearsay rule which admits hearsay

---

persons, reputation, official statements (including public records), learned treatises, commercial and professional lists, registers and reports, affidavits, statements by a voter, statements of a mental or physical condition, and spontaneous exclamations (res gestae). Wigmore on Evidence (3d ed.) §§ 1420-1764.

[3]Professor Wigmore has the following to say about the use of "res gestae" in this sense at Wigmore on Evidence (3d ed.) §§ 1767 and 1768: "The phrase 'res gestae' has long been not only entirely useless, but even positively harmful. It is useless, because every rule of Evidence to which it has ever been applied exists as a part of some other well-established principle and can be explained in the terms of that principle. It is harmful, because by its ambiguity it invites the confusion of one rule with another and thus creates uncertainty as to the limitations of both. It ought therefore wholly to be repudiated, as a vicious element in our legal phraseology. No rule of Evidence can be created or applied by the mere muttering of a shibboleth. There are words enough to describe the rules of Evidence. Even if there were no accepted name for one or another doctrine, any name would be preferable to an empty phrase so encouraging to looseness of thinking and uncertainty of decision." He then notes that the phrase "res gestae" has been applied frequently "to the Hearsay Exception for *Spontaneous Exclamations* . . . i.e. statements made during or after an affray, a collision, or the like, used to prove the facts asserted in the statement."

consisting of spontaneous exclamations "is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts." Wigmore on Evidence (3d ed.) § 1747.

We have already noted above that when the Dellamano statement inculpating the defendant was first offered through the testimony of the witness Flaherty the judge said, in then admitting it without limitation: "This is all part of the res gestae. . . . I am allowing it as part of the res gestae here." A further indication of this treatment of the disputed testimony is found in the transcript of the hearing held on November 10, 1970, on the defendant's motion for a new trial which is the subject of the present appeal. After hearing argument by the defendant's counsel that the admission of the statement, even though limited to Dellamano, violated the defendant's rights under the rule of the *Bruton* case, the judge said: "I made a finding and I repeat it now, it [the Dellamano statement] was made immediately after the shot was heard, and it is part of the transaction, part of the res gestae. Now, the Supreme Court has already acted on it, and I am not going to supervise or review or change what the Supreme Court has said." On another occasion at the same hearing the judge referred to the Dellamano statement in the following language: "This was a spontaneous exclamation. Immediately after the shot, 'George shot somebody.' "

The test of admissibility of a statement under the spontan-

eous utterance exception to the hearsay rule was stated in the following language in *Rocco* v. *Boston-Leader, Inc.* 340 Mass. 195, 196-197 (1960): "With respect to spontaneous utterances the guiding principles have been stated — and in our view correctly — by Prof. Wigmore: 'The utterance must have been before there has been time to contrive and misrepresent . . .. It is to be observed that the statements need not be strictly contemporaneous with the exciting cause; they may be subsequent to it, provided there has not been time for the exciting influence to lose its sway and to be dissipated. . . . [T]here can be no definite and fixed limit of time. Each case must depend upon its own circumstances.' Wigmore on Evidence (3d ed.) § 1750. . . . The trial judge in determining whether an utterance meets the tests of admissibility ought to be given broad discretion. . . . [A]nd only in clear cases . . . of an improper exercise of discretion should his ruling be revised." The quoted language was repeated with approval and applied in the criminal case of *Commonwealth* v. *Hampton,* 351 Mass. 447, 449 (1966). In the latter case it was held that there was no error in admitting hearsay evidence of a statement inculpating the defendant in a stabbing. The statement was made by the victim about five to six minutes after the stabbing had occurred. This is but one of a line of our decisions upholding the admission, under this exception to the hearsay rule, of spontaneous utterance of a victim of a crime inculpating a defendant who was not present when the utterance was made. *Commonwealth* v. *M'Pike,* 3 Cush. 181, 184 (1849). *Commonwealth* v. *Hackett,* 2 Allen 136, 138-140 (1861). *Commonwealth* v. *Burke,* 339 Mass. 521, 534 (1959). *Commonwealth* v. *Tracy,* 349 Mass. 87, 96-97 (1965). Contrary to the defendant's contention, the admissibility of hearsay evidence under this exception relating to spontaneous utterances is not limited to utterances of a victim or participant in the event which is the subject of the utterances. *Correira* v. *Boston Motor Tours, Inc.* 270 Mass. 88, 90-91 (1930). *Commonwealth* v. *Boyajian,* 344 Mass. 44, 47 (1962). *Commonwealth* v. *Murphy,* 356 Mass. 604, 609-610 (1970).

It was the responsibility of the judge to determine, as a preliminary matter, whether the Dellamano statement met the test of admissibility as a spontaneous utterance. The evidence was sufficient to warrant a preliminary finding of all facts essential to its admissibility against the defendant. The judge's statements and rulings indicate that he did find such facts, including the fact that Dellamano was speaking from personal knowledge when making the utterance in question. Thus the testimony of Flaherty and Barry concerning that utterance was initially properly admitted against the defendant as an exception to the hearsay rule, and its admission did not violate the *Bruton* rule.

If the defendant had been tried alone, the same testimony would have been admissible against him under the hearsay rule exception which relates to such utterances. In such a case the admissibility of the testimony would not depend on the availability of Dellamano for cross-examination by the defendant. Therefore the fact that the defendant did not have an opportunity to cross-examine Dellamano did not constitute a violation of his right under the Confrontation Clause of the Sixth Amendment. For the same reason, there was no violation of the rule of the *Bruton* case.

The judge's ultimate instruction to the jury that they were not to consider the testimony of Flaherty and Barry concerning the Dellamano utterance as evidence against the defendant, and that they should consider it only against Dellamano, was erroneous. However, the only party who could have been prejudiced by that error was the Commonwealth and certainly not the defendant.

The similar testimony of Buckley was equally initially admissible against the defendant, but it was limited to Dellamano only because the Commonwealth requested that limitation before putting the question to the witness and the defendant also requested such a limiting instruction to the jury immediately after the witness answered the question. The defendant took no exception to the question, the answer or the limiting instruction. Having participated in thus limiting evidence which was otherwise fully admissible

against him, the defendant cannot prevail in his argument that the admission of the evidence with such a limitation was error.

The defendant's motion for a new trial based on the argument that there was a violation of the *Bruton* rule was therefore properly denied.

B. *Motion for New Trial Based on Other Grounds.*

The defendant's motion for a new trial now before us is contained in the first sentence of a document entitled, "Petition for a Motion for a New Trial," which states that the defendant "moves this Honorable Court to order a new trial under *Bruton* v. *United States,* 391 U. S. 123, handed down on May 20, 1968, and followed by *Roberts* v. *Russell,* 392 U. S. 293, on June 10, 1968, which gave the *Bruton* case retroactive application to the States and Federal prosecutions." We have held above that there was no error in the denial of the motion as contained in the quoted language. The rest of the document consists of ninety typewritten pages, plus an eight page supplement thereto, of material which is in fact a brief and not a motion.[4] The result is that about 100 pages of written argument which were included in the same document with a one sentence motion for a new trial have been reproduced as a part of the record on appeal. This practice places an unwarranted burden on court personnel and on the public treasury. Such abuses can and should be avoided by appropriate order of the trial judge where necessary.

It is doubtful whether the defendant's motion for a new trial can be said, on a fair and reasonable reading, to include as the grounds thereof any one other than the alleged violation of the *Bruton* rule. However, the lengthy brief contained in the same document as the motion presumes to argue several additional grounds why a new trial is required. They are: (1) the admission in evidence of three revolvers which the defendant claims (a) were irrelevant to the case and (b) had been seized illegally by the police; (2) the denial of a

[4]The document and supplement were neither drafted nor filed by the defendant's counsel on appeal, but were apparently prepared by the defendant without the aid of counsel and were filed by him pro se.

fair trial by reason of alleged prejudicial publicity before and during the trial; and (3) the alleged failure by the prosecutor to disclose evidence favorable to the defendant.[5] Even if we assume, without so deciding, that these three grounds were actually raised in the motion for a new trial, the motion was nevertheless properly denied as to each of them for the reasons which follow.

1. When the defendant was arrested on the present indictment, the police found the three revolvers in question in a drawer of a dresser in the bedroom where the arrest was made. When the revolvers were offered in evidence the defendant's then trial counsel objected on the ground that they had no materiality to the defendant. The assignment of error and argument on the original appeal were expressly limited to the claim that the revolvers were irrelevant. This claim of error was fully considered by this court on the original appeal and was disposed of against the defendant. 352 Mass. 218, 229-230.

The defendant's present claim that the three revolvers were seized illegally by the police was first made when he filed the present motion for a new trial in 1970. The basis for the alleged illegality is that the police had no search warrant for the premises where the revolvers were found, and that the seizure was not justified as an incident to the defendant's arrest. Thus the defendant attempts to take advantage of the right to the benefit of the exclusionary rule first made applicable to States in 1961 by the decision in *Mapp* v. *Ohio,* 367 U. S. 643, which right he had a full opportunity to assert prior to or during his trial in 1965. His claim is based entirely on facts and evidence of which he had full knowledge at the time of his trial and his failure to assert it at that time effectively precludes him from attempting to do so now as matter of right. *Commonwealth* v. *Dawn,* 302 Mass. 255, 263-264 (1939). *Commonwealth* v. *Stout,* 356 Mass. 237, 241-243

[5]The same brief also presumes to argue as additional grounds for a new trial (1) the denial of a fair trial by reason of alleged prejudicial statements by the judge and prosecutor in the presence and hearing of the jury, and (2) the alleged violation by the prosecution of an order of the court for the sequestration of witnesses. However, these two grounds have been expressly waived by the defendant in a letter signed by him and sent to this court after this case was argued before us.

(1969). *Commonwealth* v. *Underwood,* 358 Mass. 506, 510-
512 (1970). *Commonwealth* v. *Richardson,* 361 Mass. 661,
663 (1972), cert. den. sub nom. *Richardson* v. *Massachu-
setts,* 409 U. S. 884 (1972).

2. One error assigned and argued on the defendant's orig-
inal appeal to this court was the denial of his motion for a
continuance based on alleged pre-trial publicity. That claim
of error was fully considered by this court and was disposed
of against the defendant. 352 Mass. 218, 224-225. The defend-
ant now seeks a new trial because of a combination of that
same pre-trial publicity and some alleged prejudicial pub-
licity during the trial which he claims came to the attention
of one of the sixteen jurors, all of whom were kept in custody
throughout the trial. Although this latter claim is not sup-
ported by anything in the transcript or other record of the
trial, the transcript of the hearing on the motion for a new
trial shows that on October 20, 1965, the judge had ques-
tioned one juror about his exposure to a certain newspaper
article relating to the defendant, had concluded that the
juror remained impartial, and had permitted him to continue
to serve.

Despite the marking of certain newspaper articles as ex-
hibits, there is no evidence or finding by the judge to indi-
cate what the juror is supposed to have seen in a newspaper,
nor whether the juror was one of the twelve who ultimately
participated in returning a verdict in the case. Indeed, at the
hearing on the motion for a new trial the defendant's counsel
stated he did not "have the information available as to which
[article] he saw."[6] The only clear conclusion which can now
be drawn is that whatever it may be about which the defend-
ant now complains, he or his trial counsel knew of it during
the course of the trial, and he had a full opportunity to save

[6]The defendant appears to be claiming that one or more newspaper articles
published on or about October 21, 1965, stated that his brother had been shot to
death on October 20, 1965, while on the way to the defendant's trial. If we assume
that a juror did see a headline or article to that effect, it is difficult to conclude that
it would entitle the defendant to a new trial in view of the fact that although the
defendant did not testify at his trial he made an unsworn statement to the jury which
concluded as follows: "I had a brother that came to this case and was shot down
coming here."

his rights and have the matter considered by this court on his original appeal. He did not do so, and cannot now do so as a matter of right. See cases cited at end of Part B, point 1, above.

3. The defendant's claim that the prosecutor failed to disclose evidence favorable to the defendant relates to records of long distance telephone calls. Herbert Josselyn had testified as a prosecution witness that he saw the defendant shoot Sheridan. To impeach him the defendant called Josselyn's sister Janice. She testified that on February 25, 1965, she made two unsuccessful attempts to reach her brother by calls to a specific telephone number in Rodeo, California, that she left a message with someone there to have him call her at her Boston number, that he did call her that same evening, that she told him the defendant had been arrested and asked him whether he could positively identify anyone, and that he said he could not, that he did not know anything, and that he "was drunk anyway." Herbert denied making such a call or having such a conversation.

On October 22, 1965, the defendant called as his witness a telephone company employee who, pursuant to a summons, produced records of all toll calls to and from Janice Josselyn's telephone for the period in question and similar records with reference to the Rodeo, California, telephone number. The records disclosed the two calls from Boston to Rodeo, but did not show any call from Rodeo to Boston on February 25, 1965.

The witness testified that he had received the records on October 5, 1965, the date the trial started, and that he had allowed counsel to see some or all of them before he took the stand. The prosecutor said he had seen them "four weeks" before the witness testified, and counsel for the defendant said he had seen them one week before the witness testified. The dispute seems to center around the present claim by the defendant that his counsel saw only the records of the Boston telephone, and not those of the Rodeo telephone before trial. The one fact which is clear from the transcript is that the defendant learned about all of the records as of October 22,

1965, when the witness testified about them, and that at no time during the trial, in the assignment of errors, or in the brief or argument on the original appeal did the defendant claim any prejudice resulting from the situation. He cannot now do so as a matter of right.

4. We thus have three issues which the defendant could have raised, but did not raise, at his trial and on his original appeal to this court. In *Commonwealth* v. *Dascalakis,* 246 Mass. 12, 24 (1923), we said: "It has been the unbroken practice both under the statute and at common law respecting motions for new trial not to examine anew the original trial for the detection of errors which might have been raised by exceptions taken at the trial." *Commonwealth* v. *Morrison,* 134 Mass. 189, 190 (1883). That this is still "the unbroken practice" is beyond question, and a motion for a new trial may not be used as a vehicle to compel a trial judge to review and reconsider questions of law which were actually raised at the trial and already reviewed by an appellate court or which could have been raised at the trial and in appellate review after trial but which were not so raised. *Commonwealth* v. *Chin Kee,* 283 Mass. 248, 256 (1933). *Commonwealth* v. *Osman,* 284 Mass. 421, 426 (1933). *Commonwealth* v. *Venuti,* 315 Mass. 255, 261-262 (1943). *Commonwealth* v. *Stout,* 356 Mass. 237, 241-242 (1969). *Commonwealth* v. *Underwood,* 358 Mass. 506, 510-511 (1970).

Although a trial judge may not be compelled by a motion for a new trial to review and reconsider questions of law which could have been raised at the trial, he nevertheless has the power to do so at his discretion. If he does so, his rulings on the questions may be presented to this court on appeal or exceptions. *Commonwealth* v. *Blondin,* 324 Mass. 564, 566-567 (1949). *Peterson* v. *Hopson,* 306 Mass. 597, 602-603 (1940). See *Commonwealth* v. *Venuti,* 315 Mass. 255, 261-262 (1943); *Commonwealth* v. *Underwood,* 358 Mass. 506, 510-511 (1970). The defendant contends that in this case the judge exercised his discretion to review the three questions described above and that therefore his action thereon is sub-

ject to review by this court. We do not agree.

The defendant through counsel started his oral argument on his motion for a new trial on November 10, 1970. When he finished his argument on the alleged violation of the *Bruton* rule, the judge said in open court: "Well, I will rule now there is no constitutional error and that substantial justice does not require a new trial on this point." The defendant duly excepted. The judge then permitted counsel to continue argument on the point to place certain citations in the record. The hearing was adjourned to November 25, 1970, at which time the defendant argued further on the *Bruton* rule and then switched to argue on the following points: prejudicial publicity before and during the trial, the admission in evidence of the three revolvers, alleged denial of access by the defendant to a material witness held in protective custody, and alleged errors in the judge's instructions to the jury. The judge reacted to these arguments with the following statement: "Now, wait. How many times has the defendant a right to go before the Supreme Court? There are plenty of times, this was decided in 1967, the trial was in 1965, the defense had two years time to present all these arguments that you are mentioning now because the record was available. He had able counsel. The Supreme Court then read the whole record. That means the transcript of the evidence, that means not only the charge but the whole case, and they have acted on it. Now you want me to reconsider what the Supreme Judicial Court has done and say the Supreme Judicial Court is wrong. But I should exercise my discretion over and above the Supreme Judicial Court. Well, I don't intend to do that. But I want to protect your rights. I will let you argue this point so that if the Supreme Judicial Court wants to rehear this matter, wants to reconsider this matter, that is their privilege, certainly not mine."

The judge's denial of the motion for a new trial in so far as the alleged violation of the *Bruton* rule was concerned, followed by his language quoted above after the defendant tried to argue other grounds for the motion, indicated as clearly as possible that he did not intend to exercise his dis-

cretionary power to review and reconsider any questions which the defendant could have raised at his trial or on original appeal. The judge never passed on these additional questions. "[H]is simple denial of the motion shows no intention on his part to exercise his discretion in favor of considering such questions." *Commonwealth* v. *Venuti,* 315 Mass. 255, 261-262 (1943). *Commonwealth* v. *Underwood,* 358 Mass. 506, 510-511 (1970). *Commonwealth* v. *Richardson,* 361 Mass. 661, 663 (1972), cert. den. sub nom. *Richardson* v. *Massachusetts,* 409 U. S. 884 (1972). "He did not attempt to follow the unusual course of exercising his discretion to consider all requests even though they might have been raised at the original trial." *Commonwealth* v. *McKnight,* 289 Mass. 530, 544 (1935). The fact that the judge permitted the defendant to argue questions on the motion for new trial which could have been raised at the trial, but then did not himself exercise his discretionary power to consider them anew, does not entitle the defendant to have them decided by this court on his appeal from the denial of the motion for a new trial.

5. There was no error in the judge's denial of the defendant's motion for a new trial.

C. *Motion to Inspect Grand Jury Minutes.*

On April 14, 1965, the defendant filed a motion that he "be permitted to inspect and make copies of the testimony of the witnesses who testified before the Grand Jury," and that this was necessary to enable him "to prepare his defense properly." The motion was heard and denied on September 27, 1965, and the defendant excepted to the denial. The denial of this motion was one of the errors assigned in connection with the defendant's original appeal to this court. However, this alleged error was not argued or otherwise mentioned in the defendant's brief on the appeal and it must therefore be deemed to have been waived. "The court need not pass upon questions or issues not argued in briefs." Rule 13 of the Rules for the Regulation of Practice before the Full Court (1962), 345 Mass. 787, effective February 19, 1963. (See now S.J.C. Rule 1:13, 351 Mass. 738, effective June 1,

1967.) *Commonwealth* v. *Dyer,* 243 Mass. 472, 508 (1922), cert. den. sub nom. *Dyer* v. *Commonwealth,* 262 U. S. 751 (1923). *Commonwealth* v. *Gale,* 317 Mass. 274, 276 (1944). *Commonwealth* v. *Iannello,* 344 Mass. 723, 724, fn. 1 (1962).

The defendant, having thus waived his right of appellate review of the denial of his pre-trial motion to inspect and make copies of the grand jury testimony, filed a new motion on October 14, 1970, that the Commonwealth be required to furnish him with the minutes of grand jury proceedings in his case. This new motion was heard and denied on that date, and the defendant now asks this court to review the denial, having included it in his present assignment of errors.

We deem it appropriate to note that this second attempt to place before us the denial of access to the minutes of the grand jury has probably also been waived for failure to argue the point in the defendant's present brief. The total treatment of this point in the brief consists of a reproduction of his 1970 motion and a "suggestion" that the necessary "particularized need" for the grand jury minutes was shown, thereby entitling the defendant to inspect them. In *Lolos* v. *Berlin,* 338 Mass. 10, 14 (1958), we said: "The requirement of Rule 13 [now Rule 1:13] is no mere technicality. It is founded on the sound principle that the right of a party to have this court consider a point entails a duty; that duty is to assist the court with argument and appropriate citation of authority." Accord, *Commonwealth* v. *Martin,* 358 Mass. 282 (1970); *Commonwealth* v. *Roberts,* 362 Mass. 357, 369 (1972). Cf. *Commonwealth* v. *Nassar,* 351 Mass. 37, 41 (1966). The defendant's brief does not fulfil such duty, failing as it does to provide any real amplification of or supporting authority for the blank assertions made in the motion itself. However, there are further reasons for deciding against the defendant on this issue.

The first is that on record before us there is no showing of the defendant's particularized need for access to the grand jury minutes when he made his 1970 motion therefor. The second is that if in fact there ever were such a need, it was the

same need which existed when the defendant made his first motion for access to the grand jury minutes before his trial in 1965. As we have stated above, the defendant waived his right of appeal from the denial of his 1965 motion, and he could not then unilaterally decide to prosecute the appeal in 1970 by the stratagem of filing a new motion for access as incident to a motion for a new trial. See cases cited at end of Part B, point 1, above.

There was no error in the judge's denial of the defendant's 1970 motion for inspection and copies of the testimony of witnesses before the grand jury.

D. *General Conclusions.*

We have concluded that there was no error by the trial judge in denying both the motion for a new trial as to grounds other than the *Bruton* rule and the 1970 motion for access to the grand jury minutes principally because the motions raised only questions which could have been raised prior to or at the trial or on the appeal which followed. However, in so doing we do not imply or intimate that there is any merit to the defendant's claims thus rejected. *Commonwealth* v. *Venuti,* 315 Mass. 255, 261 (1943). *Commonwealth* v. *Kiernan,* 348 Mass. 29, 33 (1964). It is our opinion that if we were to treat in detail each of the claims of error involved in the motions, our conclusion would be that individually or together they do not give rise to a cause for reversal.

There are two remaining assignments of error requiring attention. Both relate to the death sentence imposed on the defendant. That sentence has never been vacated, but its execution has been stayed by successive court orders. The most recent stay was granted by a Justice of this court on May 31, 1973, to continue pending the hearing and determination of the defendant's appeals presently before this court. The defendant's motion for a new trial which was filed, heard and denied in 1970 raised no question about the death sentence.

On June 29, 1972, before the defendant filed his assignment of errors on the present appeal, the case of *Furman* v.

*Georgia,* 408 U. S. 238, was decided. It held, basically, that statutes such as G. L. c. 265, § 2, as appearing in St. 1951, c. 203, allowing a jury full discretion to make a binding recommendation that a death penalty which is otherwise mandatory be not imposed, are unconstitutional. In *Stewart* v. *Massachusetts,* 408 U. S. 845, decided the same date, the court ordered that the judgment which had been affirmed by this court in *Commonwealth* v. *Stewart,* 359 Mass. 671 (1971), be "vacated insofar as it leaves undisturbed the death penalty imposed, and [that] the case . . . [be] remanded for further proceedings." This court thereupon ordered that the defendant Stewart be resentenced to life imprisonment. A similar procedure was followed in *Commonwealth* v. *LeBlanc, ante,* 1, 14-15 (1973).

When the defendant filed his assignment of errors on the present appeal on September 29, 1972, he tried to take advantage of the intervening decision in the *Furman* case by making the following claims as separate alleged errors: (a) that in light of the *Furman* and *Stewart* decisions invalidating his death sentence the exclusion from the jury of persons not believing in capital punishment was an arbitrary denial of his constitutional right to a fair trial, that a life sentence cannot be imposed under G. L. c. 265, § 2, without the recommendation of a jury, and that he is therefore entitled to a new trial, and (b) that his death sentence is invalid under the Eighth and Fourteenth Amendments to the Constitution of the United States as interpreted by the *Furman* and *Stewart* decisions and that it must therefore be revoked.[7]

The defendant's present claim that he is entitled to a new trial on the basis of the *Furman* and *Stewart* decisions was not and, of course, could not have been asserted in the mo-

---

[7]These two contentions are made in assignments of error numbered 3 and 5, respectively. In oral argument before this court, counsel for the defendant stated that the defendant wished to waive the argument contained in his brief on these two points. Counsel confirmed this waiver by a letter to the court dated April 2, 1973. About April 20, 1973, the defendant personally sent a letter to this court listing various matters which he waived or did not waive. One paragraph of the letter was: "2. I do not wish to waive . . . [the argument] set out in the brief and as based upon Assignment of Error No. 3, but not as based upon Assignment No. 5." Since it is not clear what this statement means as to Assignment No. 5, we resolve the uncertainty in favor of the defendant and conclude that he does not waive that assignment of error.

tion for a new trial filed, heard and denied about twenty months before these decisions were handed down. The judge who denied the motion did not consider or pass on the present claim. The scope of the appeal from the denial of the motion cannot be enlarged at the option of the defendant to include this new claim not previously presented to the trial court. The claim is not properly before this court at this time and therefore we do not pass on it nor intimate any opinion on its merits.

We think it necessary to add one final observation in this case. The defendant has had his case in the courts for eight years to date and has come before the full court twice. He has changed counsel five times during his State proceedings and is represented by a sixth attorney in an action he has pending in the Federal court. Yet despite this indication that the aid and advice of counsel have always been available to him, the record and transcripts show the defendant has continually attempted to dictate and control their action, at times drawing his own pleadings and at times refusing to follow their advice. It is inevitable that this frequent change of counsel, combined with the defendant's insistence on control, would lead to misunderstandings and confusion in the handling of his case. If the defendant's rights have been injured during this process, he alone is responsible, and he cannot come back to the courts claiming he has lacked effective assistance of counsel and deserves special treatment.

The orders denying the 1970 motion to inspect the grand jury minutes and the motion for new trial are affirmed. Under the *Furman* and *Stewart* decisions the defendant is entitled to have the death sentence against him vacated and to be resentenced to life imprisonment. Therefore, in keeping with the procedure established in *Commonwealth* v. *LeBlanc, supra,* the judgment against the defendant, in so far as it imposes the death sentence, is reversed, and the case is remanded to the Superior Court which is to resentence the defendant to imprisonment for life.

*So ordered.*