COMMONWEALTH *vs.* EDWARD R. BEAULIEU & others (and two companion cases against the same defendants).

Essex.    December 6, 7, 1955. — March 5, 1956.

Present: QUA, C.J., WILKINS, SPALDING, WILLIAMS, & WHITTEMORE, JJ.

*Homicide. Robbery. Conspiracy. Practice, Criminal,* Exceptions: whether error harmful. *Evidence,* De bene evidence, Admissions and confessions, Demonstration, Judicial discretion. *Military Law. Constitutional Law,* Self incrimination. *Error,* Whether error harmful.

There was no error at the trial of an indictment for murder in refusing to permit a conviction of manslaughter upon evidence that the defendant participated in an assault causing the death of the victim and

Commonwealth *v*. Beaulieu.

occurring either after a robbery of the victim was over and for no justifiable [motive or in the course of the commission of the robbery. [643–644]

Conviction of two of the defendants at a criminal trial on charges of conspiracy to rob and robbery was warranted by evidence that they with others joined in a plan to "roll . . . [one] for his money" and that thereupon the intended victim was enticed into an automobile with the group and taken to a secluded place where he was put in fear through remarks addressed to him, money was taken from him, and he was then assaulted. [646–647]

A finding of guilty of murder in the second degree was warranted by evidence that the defendant struck the victim in the stomach for no justifiable motive and that the victim died shortly thereafter from abdominal injuries. [647–648]

At a criminal trial, notes of a conversation with the defendant made by a police officer a day or two after the conversation and typed by somebody else, not produced by the Commonwealth in response to a demand made by the defendant before trial, did not become available to the Commonwealth as evidence on the ground that the defendant inspected the notes and used them in cross-examination. [649]

The admission in evidence de bene at a criminal trial of notes of a conversation with the defendant made by a police officer did not harm the defendant where the substance of the notes had been previously testified to by the officer. [649]

Notes made by a police officer of a conversation with the defendant in a criminal case were admissible in the discretion of the judge where they could not prejudice the defendant and he on cross-examination had attacked the officer's credibility by developing variances between the officer's accounts of the conversation on the stand and in the notes. [649–650]

There was no error at a criminal trial in allowing notes of a conversation with the defendant made by a police officer and admitted in evidence de bene to remain in evidence where no motion was made to strike them out. [650]

Evidence of the circumstances in which two enlisted men of the United States Marine Corps at the request of civilian police were conducted to a police station by a shore patrol officer in the United States Navy and were there interrogated by the police after having been told by the navy officer that "they were there for questioning" regarding a homicide did not show that the interrogation was one constructively conducted by the navy officer, although either he or a boatswain's mate was present during the interrogation, and evidence that the navy officer warned the men that under art. 31 of the Uniform Code of Military Justice, U. S. C. (1952 ed.) Title 50, § 602, anything they said "could be used against them at a subsequent trial by court martial" negated any implication that he or the United States military authority in his person was directing them to talk or suggesting that they had better do so. [651–652]

Testimony of a shore patrol officer in the United States Navy and of a civilian police officer at a criminal trial warranted a conclusion that two marines in the custody of the navy officer had been given a warning substantially in compliance with art. 31 of the Uniform Code of Military Justice, U. S. C. (1952 ed.) Title 50, § 602 (b), before making statements to the civilian police upon questioning respecting a homicide. [652–653]

Statements made to civilian police by two marines when questioned by the police respecting a homicide while in the custody of a shore patrol officer in the United States Navy were not made inadmissible at their subsequent trial for the homicide in a Massachusetts court by art. 31 of the Uniform Code of Military Justice, U. S. C. (1952 ed.) Title 50, § 602, even if the warning required by (b) of that section was not given before they made the statements. [653–654]

Self incriminating statements respecting a homicide made by one to police, even if made without his having been advised of his right not to make any statement, were not barred from evidence at his subsequent trial for the homicide in a Massachusetts court by the Fifth and Fourteenth Amendments to the Constitution of the United States or by art. 12 of the Declaration of Rights of the Massachusetts Constitution. [654–655]

At the trial together of indictments against four defendants for conspiracy to rob, robbery, and murder, no error was shown respecting one of the defendants in permitting a witness to demonstrate how another defendant, in the course of a confession after the conspiracy had ended and in the absence of the first defendant, had shown that the first defendant had struck the victim while carrying out the common plan to rob, where the trial judge properly limited the witness's demonstration to use against the defendant making the confession. [655–656]

THREE INDICTMENTS, found and returned on January 14, 1955.

The cases were tried together in the Superior Court before *Cahill, J.*

*Joseph B. Harrington,* for the defendant Boisvert.

*David D. Dretler,* for the defendant Beaulieu.

*John A. McNiff,* for the defendant Weaver.

*Samuel F. Hyland,* Assistant District Attorney, (*Martin C. Goldman,* Assistant District Attorney, with him,) for the Commonwealth.

WHITTEMORE, J.   The defendants Edward R. Beaulieu, Robert E. Weaver, and Donald F. Boisvert, with Arthur A. Gauthier, were indicted for the murder of Harold E. Blodgett and for conspiring to rob and robbing him.   These are appeals by Beaulieu, Weaver, and Boisvert from con-

victions as follows: Beaulieu and Weaver of murder in the second degree; Weaver and Boisvert of conspiracy to rob and robbery. Gauthier did not appeal.

The four defendants met in the Excel Café in Salem in the late evening of November 16, 1954. By the time of the crime each had had much to drink. While in the café some one or more of them conceived the idea of following the victim Blodgett and robbing him. It had been believed, mistakenly as it turned out, that Blodgett had left the café with considerable cash. After midnight the defendants, in an automobile of which Weaver had the temporary use, followed Blodgett, enticed him into the automobile by purporting to enlist his help to find the Salem hospital, and drove him to Mooney Road in Salem, a deserted cart track in brush and bushes. Blodgett also had been drinking. Some distance in on Mooney Road, at a clearing, Blodgett was assaulted, robbed of $1.25, and left in a dazed and weakened condition. The defendants drove some fifty or seventy-five feet back on Mooney Road, stopped the automobile, and started back to where Blodgett was. Further assaults occurred. There was evidence from which it could have been found that the return was to search Blodgett's shoes for more cash, or that it was so that he would not be able to recognize his assailants. Blodgett was found dead later that morning.

I.

The defendant Beaulieu argues here only that the judge erred in refusing to permit the jury to find him guilty of manslaughter. The defendant Weaver has assigned and argued the same alleged error. There is nothing in this. Manslaughter is the unlawful killing of another without malice. Malice is any unlawful and unjustifiable motive. *Commonwealth* v. *Lussier, ante,* 83, 92, and cases cited. "[M]alice is implied from any deliberate or cruel act against another, however sudden." *Commonwealth* v. *Webster,* 5 Cush. 295, 304. We assume, for this point, as the defendants contend, that it could have been found the robbery

was over before the decision to return and that death was caused by the second assault. No justifiable motive is suggested for the second assault. If the robbery was over, no motive can be imagined for the second assault other than to cover a crime, to make the victim suffer because he did not have more money on his person, or to give vent to other shocking impulse. If any defendant did not participate in the delivery of the blows directly or indirectly, the robbery being over, he was innocent. If he did he was guilty of murder. Of course if the robbery was not over, as could have been found, killing by the second assault was in the course of the commission of a crime punishable with imprisonment for life (G. L. [Ter. Ed.] c. 265, § 19) and as such was murder in the first degree (§ 1).

## II.

Boisvert's assignments of error numbered 2 and 3 were that the judge erred in denying his motions for directed verdicts of not guilty of robbery and not guilty of conspiring to rob. "An essential element of . . . [robbery] is that force and violence must be exerted on the person from whom the property is stolen or that such property be taken by means of putting such person in fear." *Commonwealth* v. *Novicki,* 324 Mass. 461, 465.

Boisvert at the trial testified that he did not know of the prior plan to take Blodgett's money and that he thought Blodgett was being picked up so that Weaver could "finish out his argument" with him,[1] maybe by an apology, and that the automobile turned into Mooney Road to allow Boisvert to relieve himself and continued farther on to turn around. He testified also that after the automobile had stopped at the scene of the crime he heard Gauthier say "Okay, you know why we are here. We want your money," and he agreed that he then knew "they were out to get

[1] There was testimony of a verbal brush in the café between Weaver and Blodgett over the use of a bowling machine.

his money" and that he was "right there when they were doing it." Also, he testified, he saw Blodgett with his hands up. Weaver testified that when he came out of the Excel Café "Boisvert and Gauthier were standing there on the sidewalk; there was words being spoke . . ."; that Beaulieu asked him about the girl Weaver had been talking with and that Gauthier or someone, "I don't want to say Gauthier," "asked me did I want to take him [referring to the man at the bowling machine, namely, Blodgett], did I want to roll him for his dough"; and that Weaver said, "'It is all right with me.' So we was walking across the street and I said, 'Where is he?' . . . and Boisvert said, 'He just went around the corner.'" Boisvert testified that when the automobile stopped he talked to the man, saying "hello or something to that effect . . . I don't know just what I said . . . I didn't ask him to the Salem Hospital because I knew where the Salem Hospital was."

Beaulieu testified that there was no agreement in the café among the four defendants to get money from Blodgett; that when they came out of the café he went back in to get Weaver and Gauthier, leaving Boisvert outside, and he told Boisvert "to keep his eye on Mr. Blodgett"; that when the group formed Boisvert said in respect to Blodgett, "He just went around the corner"; and that when the automobile overtook Blodgett he heard someone, he believed Boisvert, ask Blodgett something about "the Salem Hospital . . . I think he was asking him how to get there." Beaulieu testified also that at the scene of the crime he saw Blodgett with his hands in the air over his head; that Gauthier told him to put them there; and that Boisvert was there or near by and it was then that he (Beaulieu) reached into the victim's pocket and took out some money. It was undisputed that after the automobile stopped at the scene of the crime Boisvert and Weaver took off their marine uniform jackets. Gauthier testified that this was while all four of the defendants were gathered behind the automobile and while the victim was still in it, and that there was then talk between Weaver and Boisvert about

doing this. "Something was said, 'It is best that way because the guy won't be able to recognize you if you ain't got your blouse on.'" Gauthier testified also that while Boisvert was standing just to the rear of the automobile, near the right rear fender, Gauthier opened the door on that side and said to the man, "'You know why we are up here, because we want your money,' words to that effect"; that the man said he had none; that Gauthier asked him to get out of the automobile; that he did so and then "Somebody told the man to raise his hands or . . . words to the effect of such"; that "[t]he man turned around facing the car and raised his hands above his head"; and that Gauthier then took a wallet out of his pocket and Beaulieu "was fishing in the pockets on his left . . . ." It was not until after the $1.25 was found by Beaulieu in this search, according to all the testimony of the defendants at the trial, that anyone hit the victim. Boisvert admitted slapping Blodgett once, as he said in his testimony.

One or more police officers who questioned Boisvert before and after the warrants were issued testified that Boisvert said that all four defendants intended to rob Blodgett to relieve the man of his money, and to "follow the drunk and roll him for his money"; that all four defendants had said they knew what they were doing although they had had plenty to drink; that Boisvert had first said that he slapped the victim to rouse him, but that later, when pressed, he acquiesced in the statement that he hit him with his closed fist.

There was also testimony from police officers that the defendants other than Boisvert had implicated Boisvert in the conspiracy and in the beating.

The testimony of Boisvert and his codefendants at the trial of what happened before and during the assault and the taking of Blodgett's money was sufficient to justify sending the case to the jury on the issue of Boisvert's joining in a conspiracy to rob and participating in a robbery as an accomplice. It was open to the jury to conclude that the remarks addressed to Blodgett, including instructions to

put his hands up, put him in fear and that the property was taken from him by means of having put him in fear. The subsequent conduct of the group or some of its members confirmed an intent to use force which the jury could have found was communicated to Blodgett by their prior words and conduct. It was a jury question whether, as Boisvert testified, he was innocent of intent until he reached the scene of the crime and whether, as he testified, he did in fact protest aspects of the subsequent attack, and whether that showed that he was not participating in a robbery.

The testimony of the police officers, of what Boisvert told them, was admissible, *Commonwealth* v. *Jokinen,* 257 Mass. 429, *Commonwealth* v. *Szczepanek,* 235 Mass. 411, and discussion under section V following.

We do not consider in this connection what the officers testified the other defendants, in their statements prior to the trial, said about Boisvert's participation in the crime.

Weaver assigned as error the same points, that is, that there was error in not directing verdicts for him as to robbery and conspiracy to rob. There was similar testimony as to his presence at the scene. He testified that he acquiesced in Gauthier's proposal, in substance, to follow Blodgett and take his money. The jury were not required to believe his testimony that he sought to withdraw from the common enterprise or that any attempted withdrawal was effective. Gauthier testified that Weaver hit Blodgett in the midsection several blows with his fists. It was for the jury whether Weaver had a part in the conspiracy to rob and in the robbery. No error is shown.

### III.

There was no error in refusing to direct a verdict for Weaver on the indictment charging murder. Apart from the testimony of Gauthier that Weaver hit the victim in the stomach, taken with the evidence that Blodgett died one or two hours after the beating and that the cause of death was blunt injuries to the abdomen with rupture of

the mesentery and omentum with resulting hemoperitoneum and shock, there was enough evidence to support a verdict against Weaver under the principle stated in *Commonwealth v. Devereaux*, 256 Mass. 387, 392. And see *Commonwealth v. Lussier, ante,* 83.

## IV.

The defendant Weaver assigned as error numbered 3 the admission of notes made by Lieutenant Tully of the Salem police of a conversation with the defendant Weaver. Lieutenant Neville had testified to conversations with the defendants Boisvert and Weaver. Lieutenant Tully then testified to conversations with these defendants in part by affirming in substance what Lieutenant Neville had testified to, without repetition, and in part by direct testimony. On cross-examination Weaver's counsel asked if he had made notes of the conversation. He answered that he had, a day or two later, but that he did not have them in court. At that point the assistant district attorney handed the notes to the witness who then said, "They are right here." Weaver's counsel then examined them, and with their aid elicited from the witness testimony not previously given, namely, that Weaver had told him that Weaver had said to Gauthier before the group had come to the precise scene of the first assault on Blodgett that he, Weaver, "wanted to withdraw from the whole affair." It was also shown that, in error, another café in place of the Excel was referred to in the notes. The witness had previously testified, as to the return to the scene of the second assault, that Weaver had said, "We went back" (meaning that all four had returned). Counsel directed the attention of the witness to the statements in the notes reading, "I asked him why he stopped and went back to Blodgett, especially after the terrific beating Blodgett had received and they knew he had no money. His reply was that he supposed they went back [so that he would not be able to recognize them.]" The bracketed words from the text were not read in the examiner's question. The witness interjected "'They' in-

cluding — meaning the whole four," and when asked if he was not writing down what Weaver told him said that the notes were "notes that I made of what he told me, yes." It had been in issue whether Boisvert had only slapped Blodgett, or had hit him with his fist. Counsel directed attention to the sentence, "[H]e said . . . he did see Boisvert slap Blodgett very lightly," and the witness said, "Yes, that is right." The witness agreed that the notes had made no mention of Boisvert sleeping on the return trip, although he had testified on direct examination that Weaver had said Boisvert had done so. Then the transcript shows, "Q. Well, these notes aren't completely accurate, are they, Lieutenant? A. Well, I didn't type them up. Q. Somebody else typed them? A. Somebody else typed them." The assistant district attorney then offered the notes in evidence. On objection the judge, after conferring with counsel, ruled that they might be marked de bene which was done, and Weaver's exception was noted. At the end of short redirect examination the assistant district attorney read the notes to the jury.

The defendant's request to see the notes and his inspection of them did not make them available as evidence at the option of the Commonwealth, and the case was not altered by the fact, stated in the Commonwealth's brief, that the paper had been the subject of a demand to produce made before trial. The paper was not produced in response to that demand. *Capodilupo* v. *F. W. Stock & Sons*, 237 Mass. 550. *Renwick* v. *Eastern Massachusetts Street Railway*, 275 Mass. 145, 147–148. *Shear* v. *Rogoff*, 288 Mass. 357, 362–363.

The admission however did not harm the defendant. Except for the variances developed by his counsel's examination, the substance of the notes had been previously testified to, either by affirmation of Lieutenant Neville's testimony or directly. Furthermore, since the examination had placed in issue the credibility of the witness and the admission of the notes could not prejudice the defendant, it was within the discretion of the judge to admit them.

This enabled the jury to see the full extent of any variances between the testimony as first, or later, given and the notes. If this served to emphasize the variances, that could not have harmed the defendant. The admission of the notes may have deprived the defendant of an inference that there were more variances than in fact was the case. He was not entitled to that inference.

Neither the Commonwealth nor the defendant has mentioned the "de bene" qualification of the admission or the absence of a motion to strike prior to the reading of the exhibit or thereafter. We therefore have considered the point made apart from this aspect of the matter. But it would appear that failure to move to strike at the appropriate time was sufficient to dispose of it. In the charge the judge said, "The only de bene matter . . . allowed in . . . was the report of Lieutenant Tully. No motion to strike that out was had so that bit of evidence is regularly before you." See *Commonwealth* v. *Johnson,* 199 Mass. 55, 59; *Clarke* v. *Fall River,* 219 Mass. 580, 586; *Haskell* v. *Cunningham,* 221 Mass. 49, 53; *Alden Bros. Co.* v. *Dunn,* 264 Mass. 355, 362; *Solomon* v. *Dabrowski,* 295 Mass. 358, 360.

## V.

The defendants Boisvert and Weaver were enlisted men in the United States Marine Corps and were ambulatory patients at the United States Naval Hospital at Chelsea, Massachusetts, at the time of the crime. On the afternoon of November 17, 1954, the day of the crime, Chelsea police officers asked the authorities at the hospital for an opportunity to interrogate Boisvert and Weaver. As a result of this request Commander Walter J. Buckley USN, director of discipline and district shore patrol officer for the First Naval District, conducted the two defendants to the Chelsea police station where they were interrogated and made statements to Chelsea and Salem police. Thereafter they were returned to the hospital and upon the exhibition of warrants for their arrest they were surrendered by the military authorities to the civilian police.

Boisvert and Weaver each contends that it was error to admit in evidence against him the statements made by him while in the constructive or actual custody of Commander Buckley because of provisions of United States statutes applicable to them.  There was no error.

Article 31 of the Uniform Code of Military Justice, U. S. C. (1952 ed.) Title 50, § 602, provides in part: "(a) No person subject to this chapter shall compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him.  (b) No person subject to this chapter shall interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial. . . . (d) No statement obtained from any person in violation of this section, or through the use of coercion, unlawful influence, or unlawful inducement shall be received in evidence against him in a trial by court-martial."

The interrogation was in fact by the civilian police and not by Commander Buckley.  We do not think it was constructively interrogation by Commander Buckley because of his presence during part of the questioning and the presence of a boatswain's mate, assisting him, while he was not in the room.  There was no order or implied order to talk and there was no compulsion in the circumstances.  The handcuffing of the defendants while being conducted from the hospital to the police station and return was a reasonable precaution; Buckley was responsible for their return and the risk of an attempted escape was obvious.  Buckley did not order the men to answer questions.  The statements to them that they "were wanted for questioning" and that "they were there for questioning" did not imply that they must answer.

What was actually said negatives any implication to that effect.  Buckley testified that he told these men that "they

were wanted for questioning regarding a homicide . . . and I warned them under the 31st Article of the Uniform Code of Military Justice that anything they said to me could be used against them at a subsequent trial by court martial." If that was all that was said, as these defendants contend, it nevertheless served fully to negative any implication from any of the relevant circumstances that Buckley, or the United States military authority in his person, was directing the defendants to talk, or suggesting that they had better do so. The fair implication of a warning that things said might be used against the speaker is that the person warned should consider well whether he ought to answer.

The defendants Boisvert and Weaver contend that in any event the warning did not comply with the statute as it did not expressly include the statement that the men did "not have to make any statement." We think that there was sufficient evidence to support a finding that the warning had been given substantially as the statute requires. The additional testimony on the point was as follows: Commander Buckley was asked if what he had just stated (set out above) was to the best of his recollection. He answered, "I couldn't say word for word. I did warn them under Article 31." On cross-examination the record shows: "Q. Did you tell them they did not have to make any statement regarding that offence but if they did to you it would be used against them? A. That is correct, under Article 31. Q. Did you tell them it would be used in the trial of a court martial? A. Any subsequent trial or court martial were the words I used." On redirect, this appears: "Q. . . . [Y]ou warned Weaver and Boisvert . . . that they did not have to answer any question that you would ask them? . . . A. I warned them under 31 Article any statements made to me could be used against them at a subsequent trial by court martial. . . . [That is the] gist of a conversation with them. Q. That is the entire warning that you gave them? A. Yes." Lieutenant Renfrew of the Chelsea police testified that when Boisvert and Weaver came into the police station, Commander Buckley and a

boatswain's mate and Lieutenant Neville (of the Salem police) were there, and that Commander Buckley told Lieutenant Neville "that he had warned these men of their right under the law of the United States Military Code of Justice, Article 31 I believe he said, he had warned them that anything they said might be used against them, they were not under arrest and would be later on taken back to the Naval Hospital." Lieutenant Renfrew also testified that "following that" Weaver was taken into an adjacent room, the handcuffs were taken off, and he was questioned, and that either Buckley or the boatswain's mate was present during the questioning. The testimony of Buckley above referred to was given in the absence of the jury on the question of the admissibility of the statements. When examined before the jury he testified, "I informed them under Article 31 of the Uniform Code of Military Justice. I don't recall the exact words I used. Q. Can you give us to the best of your recollection precisely what you said to them. A. I cannot say precisely what I said. However, it is a routine procedure to inform a man of his rights and the charges, or the suspicion of the charges." Lieutenant Renfrew's testimony above stated was before the jury after the ruling to admit the statements. On the voir dire he testified that "When both of these gentlemen were brought to the Chelsea Police Station Commander Buckley addressed his remarks to Lieutenant Neville, told him that these boys were in his custody, they were not under arrest, that he had warned them under the Code of 31 Article and he had warned them of their rights that anything they said might be used against them."

We do not think that this was a military investigation, but even if it was, and had the warning been inadequate, it does not follow that the statements would not have been admissible in the Massachusetts courts. Such a warning as the United States statutes prescribe is not required as a condition of the admission of such statements in our courts. *Commonwealth* v. *Szczepanek*, 235 Mass. 411. *Commonwealth* v. *Jokinen*, 257 Mass. 429. *Commonwealth* v. *Soaris*,

275 Mass. 291, 297–298.  *Commonwealth* v. *Mabey,* 299
Mass. 96, 98.  *Commonwealth* v. *Lundin,* 326 Mass. 551, 555.

The statute does not purport to create general rights, in
military personnel, not to have confessions used against
them in any circumstances.  It is significantly express in
confining itself to trials by court martial.  In *United States*
v. *Grisham,* 4 USCMA 694, 16 CMR 268, the United States
Court of Military Appeals held that statements made to
French police authorities were admissible in court martial
proceedings even though the accused was not advised of
his rights under art. 31 since the French police were not
acting as instruments of the American military establish-
ment in any sense.  Confirmation in this way, affecting the
accused's rights in a court martial itself, that the mandate
of U. S. C. (1952 ed.) Title 50, § 602 (b), applies only, as it
says, to a person "subject to this chapter" (interrogating
directly or indirectly), is also confirmation that § 602 (d)
means what it says — that is, in effect, that the statute is
creating a right assertable in *court martial proceedings* and
that it does not purport to create a broader right.

There would be no basis for doing so.  Granted that
Congress could direct those in the United States military
service not to permit the interrogation of persons subject
to their control in the absence of warnings (which this
statute does not do), there appears no basis for an attempt,
were it to be made, to bar the use of evidence so obtained
in State courts.  The Fifth Amendment is applicable only
to Federal actions.  Due process as used in the Fourteenth
Amendment does not require that a defendant be exempted
from compulsory self incrimination in the courts of a State.
*Twining* v. *New Jersey,* 211 U. S. 78.  *Snyder* v. *Massachu-
setts,* 291 U. S. 97, 105.  See *Palko* v. *Connecticut,* 302 U. S.
319, 325.  The privilege against self incrimination is not
inherent in the right of a fair trial and hence self incrimina-
tion is not protected against State actions by the Four-
teenth Amendment on that ground.  *Adamson* v. *Cali-
fornia,* 332 U. S. 46 (reaffirming *Twining* and *Palko* cases).
Under our cases it is clear that there is here shown no

compulsion in violation of the defendants' rights under art. 12 of the Declaration of Rights of the Commonwealth. Neither defendant was compelled to "furnish evidence against himself." A confession of guilt is prima facie voluntary. *Commonwealth* v. *Jokinen*, 257 Mass. 429, 431, and cases cited. *Commonwealth* v. *Buck*, 285 Mass. 41, 47.

The judge's ruling that art. 31 was not material to the case did not bar the introduction of evidence that the statements were not voluntary. The question asked was, "[W]hat warning are you required by your duties to give them? A. Article 31." On objection the judge ruled against the question saying, "The court has already ruled it is not material to this proceeding." This did not present for ruling any effort to put in evidence words or acts which under our decisions would show the statement to have been involuntary.

## VI.

Weaver specified error in permitting City Marshal McDonough to demonstrate how the defendant Gauthier, in the course of his confession, and in the absence of the defendant Weaver, had shown that Weaver had struck the deceased in his private parts. The admission of the demonstration was in the discretion of the presiding judge assuming that reasonably indicated cautionary instructions were given. It was undisputed by both Gauthier and Weaver that each had embarked on a joint undertaking to take Blodgett's money from his person, a project which Weaver said Gauthier or someone had proposed in order "to take him [Blodgett] . . . to roll him for his dough" and which Gauthier said Weaver had suggested in order "to take the man for a ride and relieve him of his money." It was open to the jury to find that Weaver's blows, if delivered, were in the course of carrying out the common plan. The statement by Gauthier that one member of a group for whose actions he could be held responsible had hit Blodgett was admissible against Gauthier. Allowing the witness to

demonstrate what Gauthier had shown the hitting to consist of was within the discretion of the judge. See *Everson v. Casualty Co.* 208 Mass. 214, 220. The viciousness of the demonstrated attack, the possibility that Gauthier, in thus charging Weaver with the blows which could have been found to have been the cause of death, was motivated by a self serving or vindictive purpose, and the separability of the demonstration (*Commonwealth v. DiStasio,* 294 Mass. 273, 285) were factors for consideration of the trial judge and are not controlling here.

The evidence was not admissible against Weaver or the other defendants since the conspiracy was clearly ended when Gauthier was confessing his part in the crime. *Commonwealth v. Perry,* 248 Mass. 19, 26–27. *Commonwealth v. McDermott,* 255 Mass. 575, 581. *Commonwealth v. Snyder,* 282 Mass. 401, 416. *Commonwealth v. Millen,* 289 Mass. 441, 460. *Commonwealth v. Shea,* 323 Mass. 406, 414–415. *Krulewitch v. United States,* 336 U. S. 440. Compare *Commonwealth v. Smith,* 151 Mass. 491. The judge at the time of admitting the evidence said that he had "already instructed the jury that in so far as we are presently concerned, admissions by these men are binding only on themselves." No more explicit instruction was thereafter requested in respect of this evidence. By the time the judge found it advisable to give additional general instructions as to the use to be made of statements by coconspirators, Weaver's counsel had taken a position in respect of the out of court statements of other defendants. This is shown by the judge's statement, prior to giving the additional general instructions just referred to, as follows: "[I]t is the court's understanding that the various motions by Mr. McNiff to strike out certain comments are waived. In the main, this reference consists of references to the defendant Weaver made in statements to the Salem and Chelsea police by other defendants." While this did not in terms waive objection to the demonstration by McDonough, as distinguished from his report of what Gauthier said that Weaver had done, it makes emphatic that the only claim of

error was in respect of the discretionary matter of allowing physical illustration of the spoken words.

No error is shown in respect of the admission of this evidence.

*Judgments affirmed.*