COMMONWEALTH *vs.* JANET L. WHITE.

Suffolk.    February 3, 1976. — July 30, 1976.

Present: HENNESSEY, C.J., REARDON, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Evidence,* Hearsay, Common criminal enterprise, Spontaneous utterance. *Conspiracy. Error,* Whether error harmful. *Grand Jury.*

Where extrajudicial statements implicating the defendant in a robbery were made by the other robber following his surrender after a chase by the victim and two other men, the statements were not made in the course of the robbery or any joint venture to escape and were not admissible against the defendant under the coconspirators' exception to the hearsay rule [708-712]; nor were they admissible as spontaneous or excited utterances [712-713]; nor were they admissible under any innominate exception to the hearsay rule [713-714]. BRAUCHER, J., dissenting.

INDICTMENTS found and returned in the Superior Court on June 10, 1974.

The cases were tried before *McLaughlin,* C.J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Fern L. Nesson* for the defendant.

*Alice E. Richmond,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. After trial by jury, the defendant Janet L. White was convicted on indictment No. 82711 for armed robbery, and on indictment No. 82713 for assault and battery with a dangerous weapon, and sentenced.[1] She was also convicted on indictment No. 82712 for unlawful possession of a narcotic drug (marihuana) found on her person after her arrest; the indictment was placed on file. She appealed to the Appeals Court under the provisions of G. L. c. 278, §§ 33A-33G, and we transferred the case to this court on our own motion (see G. L. c. 211A, § 10 [A]).

The questions raised are, first, on the admissibility of certain extrajudicial statements by Danny Gilbert, an alleged participant in the principal crimes whose case had been disposed of; and, second, on the legality of the composition of the grand jury which indicted the defendant.

It will be useful to state the substance of the trial testimony and we start with the Commonwealth's case. About 4 P.M., February 18, 1974, the complaining witness Thomas Slade with his two small children, aged two and three, was walking in a westerly direction on the overpass of Cummins Highway from Hyde Park Avenue, which runs north and south, toward Rowe Street (the neighborhood is Roslindale, Boston). Two black youths ran from behind Thomas and the children: a young man circled around them and stood facing Thomas brandishing a straight razor half open,

---

[1] She was sentenced to six years at the Massachusetts Correctional Institution at Framingham on the armed robbery conviction, and to a like term "from and after" on the assault conviction, the latter sentence being suspended with probation for three years.

while a young woman stood at his left. He thought she held a "shiny" object but he did not make out what it was. The pair demanded that Thomas give them all he had. As he backed away, he sensed "two things" on his left arm but paid no attention. (Later he realized they were cuts that had penetrated his clothing, drawing blood.) The young woman said, "What are you moving away from your kids for, man." Thomas took five one dollar bills from his pocket and handed them to the young man. The youths then ran back on the overpass toward Hyde Park Avenue. The encounter was very brief.

Thomas's destination had been his father's house on Rowe Street, close by. He now led his children quickly to the place and left them there. He got into his brother Robert's car, which had been parked on Rowe Street, and drove to the "Erie" pub a short distance away, at or near the corner of Hyde Park Avenue and Canterbury Street, where he had earlier spent some time with his brother and friends. At his shout, his brother and Francis Alfieri and Dennis Sugrue came out of the pub. Thomas made room for Robert at the wheel and Alfieri also boarded the car.

The car proceeded north on Hyde Park Avenue in search of the robbers. As it passed a parking lot near "White's" liquor store a block or so from the Erie pub, Thomas exclaimed, "That's them," indicating two black youths at the driveway, later identified as Danny Gilbert, aged sixteen, and the defendant Janet White, also a teenager. Thomas leaped from the car shouting, "Who got my money?" The defendant yelled, "What money, what are you talking about?" and began to run south on Hyde Park Avenue. Gilbert took off in the opposite direction.

Thomas started in pursuit of Gilbert. Alfieri and Robert also got out of the car; Alfieri headed toward Gilbert, Robert toward the defendant. Almost immediately Thomas stumbled and fell; he did not resume the chase, but returned to White's to telephone the police. Robert quickly saw that Sugrue, who had followed Robert's car on foot, had met the defendant. Robert reboarded his car and drove north on Hyde Park Avenue, passing Alfieri, and sighting

Gilbert ahead. Gilbert turned right from Hyde Park Avenue onto Mt. Hope Street with Robert following in his car and closing on him. As Gilbert started to duck into a yard, Robert stopped the car, jumped out, and seized Gilbert by the arm. Gilbert submitted without a struggle. He handed Robert five one dollar bills, and said — as testified to by Robert, over objection — "I didn't do it. She did it"; and in answer to Robert's question what he had done with the razor, "I threw it away." "Where?" "I don't know."

Alfieri meanwhile had encountered a friend, Colin Twomsley, at the corner of Hyde Park Avenue and Mt. Hope Street. He got into Twomsley's car and they came up to Robert as Gilbert was handing Robert the $5. Gilbert was placed in Twomsley's car between Alfieri and Twomsley. He kept saying — as testified to by Twomsley and Alfieri, over objection — that he didn't do it, she did it, and that he was sorry, why didn't they let him go. The three in Twomsley's car, followed by Robert in his car, went back to White's where they found Thomas, Sugrue, and the defendant. The defendant had been using swear words and saying that she was only a girl and hadn't done anything. Gilbert, addressing Thomas, said, "I'm sorry, man, I didn't mean it. I don't blame you for being mad."[2] (This was testified to by Thomas and others, also over objection.) Robert, after exhibiting to Thomas the five one dollar bills he received from Gilbert, handed them to one of the police officers who arrived on the scene. The defendant said, "That's his [Gilbert's] money" (or "ours"). Robert said, "It's too late, he already admitted it." Gilbert and the defendant were promptly taken in the police car to the station house.

The episode from the crime to the encounter on Mt. Hope Street took perhaps ten or fifteen minutes, and to the police arrests perhaps thirty or forty minutes.

---

[2] The defendant was present when this statement was made but there is no claim of an "adoptive admission" by her. She was denying guilt at all times.

As to identification of the defendant, Thomas gave no particulars of the appearance of the robbers to the others in the car as it started up Hyde Park Avenue. Thomas testified that, glancing to his left on the overpass, he observed that the young woman had an afro hairdo and was freckled, wore glasses with large rims, a green jacket with a fur collar, and dungarees. This approximated the defendant's appearance on her arrival at the police station as testified to by an officer who observed her there. But Thomas, modifying his testimony, said that he had not observed the dungarees during the incident on the overpass.

To turn from the Commonwealth's case to the defendant's: The defendant testified in her own defense and denied any part in the crime on the overpass. She said that she and Gilbert were on their way in the car of Lamarr Oduss to a bowling alley and had stopped at White's where she had been deputed to buy wine. She was diverted to watch some children sledding behind the parking lot.[3] As she and Gilbert were standing at the driveway, the Slade car bore in on them; a man was hanging out shouting profanities with the word "nigger." They were scared, and fled. Gilbert in fact had $9 as they started out from her house; he had counted the money there. She saw the police officer take money from Gilbert and give it to Thomas. She said she was wearing plaid pants, not dungarees (but was contradicted, as to some other apparel she claimed to have worn, by the picture of her taken at the station). The defendant's mother testified to the plaid pants and to the defendant, Gilbert, and Oduss being at the house, but she had not seen any counting of bills by Gilbert.

The inference the defense sought to have the jury draw was that Thomas had no clear idea of who the robbers were and fastened on the first pair of black youths in the vicinity, his "identification" of the defendant being actually his

[3] A boy, Richard Sullivan, testified to seeing the defendant and a black male companion on the overpass and again behind the parking lot where, according to the boy, the defendant's companion counted his money, and the defendant asked for a ride on the boy's sled.

observation of the defendant as captured, not that of the figure at his left on the overpass.

1. The main question for review is shaped by defense objections and exceptions to the admission in evidence of testimony as to what Gilbert said when cornered on Mt. Hope Street and during the return to White's, offered to prove the truth of Gilbert's statements as inculpating or tending to inculpate the defendant. (Gilbert did not appear as a witness at the trial.) The point was further emphasized by a motion for a mistrial[4] and objection and exception to a relevant part of the judge's charge to the jury (see our text at n.10). We believe the judge committed error requiring reversal of two of the convictions, the cases to stand for retrial.

(a) The judge relied on the coconspirators' exception to the hearsay rule[5] described in our recent decision of *Commonwealth* v. *Pleasant,* 366 Mass. 100, 103-104 (1974). Citing *Commonwealth* v. *Chapman,* 345 Mass. 251, 255 (1962), we said: " '[W]here there is proof ... that two or more persons are engaged in a common criminal enterprise,[6] the acts and declarations of one, during the enterprise and in furtherance of it, affect all.' " We were at pains to stress that "[n]ot all statements of coconspirators or joint criminal venturers are admissible against an absent defendant" [i.e., absent at the time of the utterance] .... They must be made both during the pendency of the coöp-

---

[4] Defense counsel sought at the outset to have the judge rule that the assistant district attorney should not refer to the hearsay in her opening statement, and then moved for a mistrial after the hearsay had been mentioned in the opening statement and also in Thomas's testimony. The judge denied both applications.

[5] This court has followed the practice generally adopted of calling the proposition a hearsay exception, but the recently approved Federal Rules of Evidence place it under the heading "Admission by party-opponent" which is characterized as non-hearsay. See Rule 801 (d) (2) (E).

[6] For the present evidential purpose a joint criminal venture is dealt with in the same way as a criminal conspiracy. See *Commonwealth* v. *Wampler,* 369 Mass. 121, 123-124 (1975); *Commonwealth* v. *Pleasant,* 366 Mass. 100, 103-104 (1974).

erative effort and in furtherance of its goal." These requirements are traditional and well recognized in the law of the Commonwealth, as elsewhere. *Commonwealth* v. *Flynn*, 362 Mass. 455, 476-477 (1972). *Commonwealth* v. *Stasiun*, 349 Mass. 38, 50-53 (1965). *Commonwealth* v. *Shea*, 323 Mass. 406, 414-415 (1948). See *Fiswick* v. *United States*, 329 U.S. 211, 217 (1946); Fed. R. Evidence 801 (d) (2) (E).

No doubt the evidence here, exclusive of the declarations,[7] was sufficient to warrant putting to the jury the question whether Gilbert and the defendant were engaged in a joint criminal venture comprising the robbery and assault on the overpass. But the declarations in question were not made in the course of the initiation or commission of those crimes.

Then can it be said that a trier would be warranted in finding that there was a joint venture to effect an escape, and that Gilbert's statements were made during its pendency and in furtherance of it? The judge evidently took this approach.

There may be a question whether, for purposes of the hearsay exception, the trier is entitled to assume that a joint venture to commit a crime necessarily includes a common undertaking to effect an escape, if that should become necessary. It may be that, besides the fact of attempted escape by the participants in the crime, some element of collaboration must be shown in order to justify a finding of a joint venture looking to escape, which in turn provides the necessary setting for the hearsay exception.[8] But if this further factor is needed, we think it is

---

[7] It is a condition of admission of the declarations under the hearsay exception that an adequate probability of the existence of the common venture, including participation by the given defendant, be established as a preliminary matter. See *Commonwealth* v. *Rogers,* 181 Mass. 184, 193 (1902).

[8] With respect to the rather similar situation of concealment after accomplishment of a crime, we have recently been careful to note that the coventurers "devised and undertook to implement a plan to divert attention from themselves as the ones who committed the crimes," which made it appropriate to hold that the common venture continued into a concealment phase so that declarations of one coventurer fur-

supplied here by the evidence of the circumstances of the flight from the parking lot. Cf. *Commonwealth* v. *Dellelo,* 349 Mass. 525, 530 (1965).

Granting this, we nevertheless believe that Gilbert's declarations were out of bounds for use against the defendant. This is because any common enterprise of escape ended in failure and frustration through the surrender by Gilbert of his person and profits before or just as he made his declarations. Thus the declarations were not made during the pendency of that enterprise (nor did they contribute to its furtherance). See *Commonwealth* v. *Beaulieu,* 333 Mass. 640, 656 (1956); *Commonwealth* v. *Shea,* 323 Mass. 406, 414-415 (1948). See also *Fiswick* v. *United States, supra* at 217; *Sandez* v. *United States,* 239 F.2d 239, 244 (9th Cir. 1956); *Cleaver* v. *United States,* 238 F.2d 766, 769 (10th Cir. 1956). We need not go beyond the many cases holding that declarations of the usual sort by a coventurer after he has been apprehended or arrested, admitting the crime or implicating another, while they may be admissible against himself, do not fall within the hearsay exception and cannot be offered against another coventurer to prove the matters asserted. See *Commonwealth* v. *Curry,* 341 Mass. 50, 53 (1960). See also *Wong Sun* v. *United States,* 371 U.S. 471, 488, 490-491 (1963); *Patton* v. *Indiana,* 241 Ind. 645, 648 (1961); *Commonwealth* v. *Ellsworth,* 409 Pa. St. 505, 510-512 (1963).

The Commonwealth suggests that there was a chance Gilbert might be released when he returned the money and in effect admitted but attempted to minimize his guilt, and there is thus a sense in which the enterprise of escape continued past his declarations. This is altogether wide of the mark. Gilbert was both confessing his own complicity

thering the concealment could be put in evidence against another. *Commonwealth* v. *Simpson, ante,* 119, 122 (1976). See *Krulewitch* v. *United States,* 336 U.S. 440, 443-444 (1949); *Lutwak* v. *United States,* 344 U.S. 604, 615-617 (1953). Prior precedents in the Commonwealth have not spoken clearly to the particular point. Cf. *Commonwealth* v. *Smith,* 151 Mass. 491 (1890); *Commonwealth* v. *Perry,* 248 Mass. 19 (1924).

and inculpating the defendant; even if, perchance, the pursuers might be disposed to go easy on Gilbert for his own crime, they would inevitably hold him to identify and incriminate the defendant. In fact, from the moment of his surrender Gilbert was firmly in keeping; he was placed immediately in Twomsley's car and held continuously until turned over to the police at White's, and during this period he repeated the same statements in substance. The statements themselves confirm that if any escape enterprise could possibly be said to have continued, it was not a "common" one, for Gilbert threw off on the defendant: "She did it" — carrying the meaning: she did the knifing, not he. See *United States* v. *Smith,* 520 F.2d 1245 (8th Cir. 1975) (statement exculpatory of declarant-coventurer and inculpatory of another coventurer). By that token, neither the "pendency" nor the "furtherance" requirement is met. The conditions of the hearsay exception are not to be interpreted with an impractical strictness, but, however leniently they may be read, we believe they are not satisfied in the present case.

Since the evidence did not warrant a finding that any common venture survived Gilbert's surrender, the judge should himself have ruled Gilbert's declarations to be inadmissible.[9] See *Commonwealth* v. *Dahlstrom,* 345 Mass. 130, 134 (1962). There was no basis for the judge's action in receiving the declarations in evidence and then, by his charge, casting on the jury the burden of marking just when the common venture ended, of assessing any relations of the declarations to the venture, and of then deciding whether to discard the declarations from consideration.[10]

---

[9] This exclusion need not have carried with it testimony limited to Gilbert's act of surrendering the $5 as distinguished from his declarations, as shown in *Lutwak* v. *United States,* 344 U.S. 604, 617 (1953). Cf. *Anderson* v. *United States,* 417 U.S. 211, 218-222 (1974); *Commonwealth* v. *Wampler,* 369 Mass. 121, 123 (1975).

[10] The judge's charge left very much at large how the jury were to approach the questions of the termination of the joint venture through failure and surrender, and of the nexus between any joint venture and the declarations made.

We add that the law's insistence that there be a going common enterprise, to which the declaration is shown to contribute, does not stand on a merely formal ground but is buttressed by significant policy. The mutual "agency," conceived to underlie a joint criminal venture, that justifies exposing one coventurer to the risk of being incriminated by the utterances of another (see *Commonwealth* v. *Tivnon*, 8 Gray 375, 381 [1857])[11] loses all reality when the venture collapses, and the justification disappears with it. To put the matter differently: The community of activities and interests which exists among the coventurers during the enterprise tends in some degree to assure that their statements about one another will be minimally reliable (at worst it may possibly afford any one participant adequate knowledge to meet a statement by another without the aid of cross-examination of the declarant). When the enterprise fails, there is a dispersion of interests, and motives of self-preservation, not to speak of malice or spite, may take over.[12] If the general framework of the present law is accepted, the situation just described is seen to be a thoroughly uncongenial one for applying an exception to the hearsay rule.

(b) During argument on the motion for a mistrial (see n.4), the judge, after holding to his previously expressed view that the coventurers' exception applied, referred to *Commonwealth* v. *McLaughlin*, 364 Mass. 211 (1973), a case involving "excited utterances," and spoke of Gilbert's statements as having been made "spontaneously." At the time of the colloquy about mistrial, Robert had not yet testified to the facts of the happening at Mt. Hope Street; the judge never again referred to excited utterances (there were six further exceptions to the admission of the statements) ; and the charge to the jury was definitely based on

---

[11] See Levie, Hearsay and Conspiracy: A Reexamination of the Co-Conspirators' Exception to the Hearsay Rule, 52 Mich. L. Rev. 1159 (1954); 4 J. Weinstein, Evidence: Commentary on Rules of Evidence for the United States Courts and Magistrates, par. 801(d)(2)(E)[01] (1975).

[12] See Levie, *supra* note 11, at 1173.

the coventurers' exception and nothing else. It is thus unclear whether the judge intended an actual ruling admitting the statements on an alternative theory of excited utterance. But in any event we do not think the statements were of a type falling within that theory or justification (so the trier's discretion in deciding as to the closeness of the connection between the exciting event and the utterance, and so forth, is not pertinent). The precipitating event, if any, was the apprehension of Gilbert on Mt. Hope Street, but the statements did not relate to that; they were rather a summary narrative of supposed preceding events. Cf. Fed. R. Evidence 803 (2). Statements, moreover, in which the speaker pushes blame away from himself and thrusts it on another appear not as instinctual utterances but as contrived and calculated ones. See *United States* v. *Smith, supra* at 1248. These are quite different from the statements usually accepted under the rubric. Cf. *Commonwealth* v. *McLaughlin,* 352 Mass. 218, cert. denied, 389 U.S. 916 (1967), 364 Mass. 211, 220-224 (1973) (and cases cited); on habeas corpus sub nom. *McLaughlin* v. *Vinzant,* 522 F.2d 448 (1st Cir. 1975), cert. denied, 423 U.S. 1037 (1975).

(c) It is now suggested that even though the statements may not have been admissible under any recognized exception to the hearsay rule, they might be received under an innominate exception, or rather on the basis that their admission would be in a large sense compatible with sundry recognized hearsay exceptions, and would be otherwise fair. We agree that the hearsay rule and its stated exceptions should not be regarded as a closed system without room for variations in particular cases on reasoned grounds. But it is surely not enough to justify a variation — and one to be imposed on the evidence by an appellate court, without suggestion or consideration below — that the court simply has a perception of the defendant's guilt. In the instant case the policy against admission of coventurers' statements after frustration of the venture (see [a] above) is strong and extends to the present facts whether they are assigned to a category or no category. Beyond

that, the statements on their face were damaging to the defendant not only as tending to place her at the site of the crime but also as making her the wielder of the knife, and, in the absence of the declarant, the defendant must be severely handicapped in dealing with the statements. The Commonwealth did not call the declarant as a witness and gave no explanation for its failure to do so. If standard rules were to be bent in favor of the Commonwealth and the statements admitted in hearsay form, then it would seem very reasonable to condition the admission on such an explanation by the Commonwealth.[13] Of course, none was tendered.

(d) The Commonwealth argues that any error in the admission of the statements should be regarded as "harmless." Very probably a verdict of guilty would be thought adequately supported if rendered after trial on testimony similar to that at bar but excluding the declarations. However, the declarations ran through the case and, as we have said, were damaging on their face. In the circumstances, we cannot say with requisite assurance that the error was innocuous. See *Krulewitch* v. *United States*, 336 U.S. 440, 444-445 (1949); *United States* v. *Smith*, 520 F.2d 1245, 1248 (8th Cir. 1975).

2. The defendant has questioned the legality of the grand jury that brought in the indictments against her as

---

[13] Under Rule 803(24) of the Federal Rules of Evidence, which sets up what we have called an innominate category, it appears likely that such a condition would be imposed if the statements could possibly have qualified otherwise for admission. The text of Rule 803(24) is: "Other exceptions. — A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant." See 4 J. Weinstein, *supra* at 803-5.

being unconstitutionally underrepresentative of women. This would have particular pertinence to the conviction for possession of marihuana which is not otherwise attacked. The contention is comparable to those made and overruled in a number of our cases. See *Commonwealth* v. *Hunt, post,* 861 (1976), citing the previous decisions.

> *Judgments of conviction on indictments Nos. 82711 and 82713 reversed and verdicts set aside; judgment of conviction on indictment No. 82712 affirmed.*

BRAUCHER, J. (dissenting) My reading of the transcript of the evidence convinces me that the defendant was fairly tried and that the evidence of her guilt was overwhelming. My brothers feel compelled to order a new trial, at which highly persuasive, reliable evidence is to be excluded. I am equally bound to follow the law. But the result is not compelled by the Constitution, by statute, or by any judicial precedent squarely in point. In my view, judge-made rules of law are to be tailored to justice rather than to abstract logic. Notwithstanding the impeccable logic of the court's opinion, therefore, I dissent.

The trouble, as is usual in such cases, lies in the premises on which the logic proceeds. The court proceeds on the premise that the numerous "recognized exceptions" to the hearsay rule have a magical quality and that the adverse party must be given advance warning of the precise legal theory on which an "innominate exception" is based. Robert Slade testified that Gilbert said to him, "I didn't do it, she did it." This and other out-of-court statements by Gilbert were offered to prove the truth of the matter asserted, and were therefore hearsay. They did not fit within either of the two established exceptions on which the judge relied. Therefore, says the court, he erred in admitting them in evidence, and we should not think further about the matter, since the prosecutor did not articulate in advance his common sense judgment that they did

not present the usual hearsay dangers. Moreover, since the evidence was highly reliable and important, the error was not harmless.

I take a different view, not at all original with me. "In the Federal Rules of Evidence, there are twenty-seven specific exceptions and a catch-all, essentially for any other hearsay as good as that which the rules specifically make admissible. That's complicated, and because it's complicated, it's inelegant. Why not reformulate the rule to say that hearsay is admissible unless the trial judge in his or her sound discretion thinks it fair to exclude it. That's the rule judges apply most of the time anyway. It's as much as any appellate court can do with hearsay. And it turns a clumsy contraption of exception piled upon exception into an object of plain and simple elegance." Younger, In Praise of Simplicity, 62 A.B.A.J. 632, 634 (1976). As to spontaneous utterances, we have said that the trial judge should be given "broad discretion" and that his ruling should be revised "only in clear cases." *Commonwealth* v. *McLaughlin,* 364 Mass. 211, 223 (1973), quoting from *Rocco* v. *Boston-Leader, Inc.,* 340 Mass. 195, 197 (1960).

There was evidence that Gilbert and the defendant were engaged in a joint criminal venture, and that they acted in concert in fleeing in opposite directions. But any common enterprise ended when Gilbert surrendered, the court says, and his subsequent statements therefore could not be found to be during the course and in furtherance of the joint venture. The court summarily rejects the judge's ruling that the statements, made within a few minutes after the crime, were made spontaneously and were within the *McLaughlin* rationale of the "res gestae." So far as I can discover, this is the first time in our history that we have reversed a trial judge's ruling in a criminal case on the admissibility of evidence as a spontaneous utterance. Contrast *Commonwealth* v. *Pearsall, ante,* 413, 415 (1976).

So be it. But analysis should not end there. The statements in question were highly significant as corroboration of the victim's identification of the defendant as one of those who robbed him. For any other purpose they were

worthless, and their admission in evidence for any other purpose was harmless beyond a reasonable doubt. The other facts of the robbery were fully established, and the defendant was careful not to contest them. There was no showing that Gilbert, a juvenile, was unavailable, but I do not think we should insist on a procedure calling for the Commonwealth to swear a juvenile as a witness and to force him to claim his privilege against self-incrimination. Gilbert was, of course, well known to the defendant, and there is no suggestion that he was not available to her as a witness or that the evidence of his declarations came as a surprise to her.

Eyewitness identification is one of the most troublesome aspects of our criminal law, and is probably responsible for a large proportion of the cases where innocent defendants are convicted. The problem is acute in cases such as armed robberies, involving fleeting contacts between strangers. Any rule which bars probative evidence with respect to the accuracy of eyewitness identification increases the likelihood of conviction of the innocent. Or else it transfers the truth-seeking function from the trial jury to the police and the prosecutor. For this reason we have admitted evidence of out-of-court identifications to corroborate eyewitness identifications made in court. *Commonwealth* v. *Sheeran, ante,* 82, 87 (1976). *Commonwealth* v. *Leaster,* 362 Mass. 407, 412 (1972).

"The hearsay rule, which has long been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact. Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury. *California* v. *Green,* 399 U.S. 149, 158 (1970). A number of exceptions have developed over the years to allow admission of hearsay statements

made under circumstances that tend to assure reliability and thereby compensate for the absence of the oath and opportunity for cross-examination." *Chambers* v. *Mississippi*, 410 U.S. 284, 298-299 (1973).

The possible inaccuracies to be probed by cross-examination "are usually attributed to the four testimonial infirmities of ambiguity [in the out-of-court statement], insincerity, faulty perception, and erroneous memory." Tribe, Triangulating Hearsay, 87 Harv. L. Rev. 957, 958 (1974). The largest group of hearsay exceptions is justified by specific attributes which are thought to reduce these weaknesses so substantially that the balance of untrustworthiness and likelihood of probative value favors admissibility of the evidence. Declarations against interest and spontaneous utterances ordinarily afford safeguards as to ambiguity and veracity, but not necessarily as to perception and memory. *Id.* at 964-969.

The statements here in issue, when used to corroborate the victim's eyewitness identification, present no problem of ambiguity. Even if they were too remote in time and place to come within the established exception for spontaneous utterances, there is no problem of faulty perception or erroneous memory. There is a problem of sincerity, as the court points out, since the statements push blame away from the speaker and thrust it on the defendant.

To this there are two answers. First, although in form exculpatory, taken together with the surrender of the stolen $5 the statements were highly inculpatory of the speaker. "His statement was spontaneous, and it was against his penal interest to make it. These are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant." *Dutton* v. *Evans*, 400 U.S. 74, 89 (1970). Second, the possibility that cross-examination of the speaker "could conceivably have shown the jury that the statement, though made, might have been unreliable [as corroboration of the identification of the robbers] was wholly unreal." *Ibid.*

For these reasons I would uphold the judge's ruling on

the ground that he did not abuse his discretion in admitting the evidence to corroborate the victim's eyewitness identification of the defendant. It is not a ground of reversal that he gave erroneous reasons for his correct ruling, if indeed they were erroneous. To the extent that he admitted the evidence for other purposes, any error was harmless beyond a reasonable doubt.